[No. B078065. Second Dist., Div. Two. Dec. 29, 1993.]

THE PEOPLE, Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
KAVEH SHAYAN et al., Real Parties in Interest.

## COUNSEL

Joseph Lawrence, Acting City Attorney, Jerry P. Gordon and James N. Bianco, Deputy City Attorneys, for Petitioners.

No appearance for Respondent.

Talcott, Lightfoot, Vandevelde, Woehrle & Sadowsky and Stephen B. Sadowsky for Real Parties in Interest.

## OPINION

GATES, J.—In treating with the petition for writ of mandate filed August 27, 1993, by the People of the State of California and the Santa Monica Police Department, we are directly concerned only with the propriety of the superior court's order of August 25, 1993, an order which required petitioners to return to The Wholesale Connection or its representatives approximately 1,120 car stereo components from which the manufacturers' serial numbers had been removed. These items had been obtained during the execution of a search warrant that authorized their seizure in that there existed reason to believe they might be stolen, or were possessed with the intent to use them as a means of committing a public offense.[1] In fact, at the time the challenged order was made, a complaint already had been filed in the municipal court charging Kaveh Shayan, the president and majority stockholder of The Wholesale Connection, with violating Penal Code section 537e,[2] a misdemeanor.

Why the motion seeking return of the seized items was not heard by the judge who issued the warrant, as required by subdivision (b) of section

---

[1] Other properties, not here in issue, were also seized.

[2] This section provides: "(a) Any person who knowingly buys, sells, receives, disposes of, conceals, or has in his or her possession any personal property from which the manufacturer's serial number or any other distinguishing number or identification mark has been removed, defaced, covered, altered, or destroyed, is guilty of a public offense . . . .

"(b) When property described in subdivision (a) comes into the custody of a peace officer it shall become subject to the provision of Chapter 12 (commencing with Section 1407), Title 10 of Part 2, relating to the disposal of stolen or embezzled property. Property subject to this section shall be considered stolen or embezzled property for the purposes of that chapter, and

1538.5, is not explained. Perhaps it was because it was characterized as a "nonstatutory motion," citing *Buker* v. *Superior Court* (1972) 25 Cal.App.3d 1085 [102 Cal.Rptr. 494]. Such a motion was described in *Buker* as one that "did not assert any claimed illegality of the seizure; but was made upon the ground possession of the [subject property, there currency] by the court was not necessary to prove defendants' guilt" and was needed by the defendants to employ counsel of their choice. (*Id.*, at pp. 1087-1088.)[3]

In any event, it was not contended by real parties that there was a lack of probable cause for the issuance of the warrant. Nor was it denied that the serial numbers had been removed from the subject components. It was merely alleged that, in fact, they had not been stolen, were not contraband and, despite their altered condition, they should be returned immediately since their "continued retention . . . has caused and will continue to cause substantial and irreparable injury, and that the continued retention . . . is not necessary for an evidentiary or any other legitimate purpose."

The superior court granted this motion unconditionally, permitting the People to retain only 16 designated components, all others to be delivered to real parties by 5 p.m. on Monday, August 30, 1993.

This order was made notwithstanding the fact that (1) a complaint was then on file in the municipal court, (2) certain other seized items already had been ordered returned to authorities in Arizona as being potentially stolen goods,[4] and (3) the People asserted that an investigation into the true status of the remainder had not been completed and that both the United States Attorney General and the Internal Revenue Service were investigating and/or considering instituting proceedings against Shayan for violating various federal statutes as well as tax evasion. Even more significantly, it was made despite the fact that the brief time allowed prior to the return date would not

_____

prior to being disposed of, shall have an identification mark embedded or engraved in, or permanently affixed to it.

"(c) This section does not apply to those cases or instances where any of the changes or alterations enumerated in subdivision (a) have been customarily made or done as an established practice in ·the ordinary and regular conduct of business, by the original manufacturer, or by his or her duly appointed direct representative, or under specific authorization from the original manufacturer."

All further references are to the Penal Code unless otherwise indicated.

[3]Real parties also asserted that the subject items should be returned because they had not been specifically described in the warrant. However, if during the execution of a search warrant evidence of a crime is discovered in plain view, it may be seized whether enumerated or not. (*Horton* v. *California* (1990) 496 U.S. 128, 142 [110 L.Ed.2d 112, 126, 110 S.Ct. 2301].)

[4]The serial numbers on these particular articles had not been removed. Real parties advise us that since the order under review was issued, these items have been returned to them.

permit the police to affix new identification marks on these many items as required by subsection (b) of section 537e. Consequently, we issued an alternative writ.

Real parties, Kaveh Shayan and The Wholesale Connection, did not, and do not, actually challenge any of the contentions made by the People. Rather they urge, in essence, that section 537e does not apply to them. They argue that even prior to trial of the pending prosecution we should hold that they were, and are, entitled to remove both the visible and the secret manufacturer's serial numbers from any and all products with which they deal, replacing them with numbers of their own, and thereafter sell them to retailers at a price below that charged by the manufacturers and/or their authorized affiliates. They refer to this as merchandising "parallel" goods or engaging in "gray market" activities. Citing *K Mart Corp.* v. *Cartier, Inc.* (1988) 486 U.S. 281 [100 L.Ed.2d 313, 108 S.Ct. 1811], *NEC Electronics* v. *Cal Circuit ABCO* (9th Cir. 1987) 810 F.2d 1506, and *Monte Carlo Shirt, Inc.* v. *Daewoo Intern. (America)* (9th Cir. 1983) 707 F.2d 1054, they contend that such an enterprise is legitimate and, therefore, section 537e may not be applied to them.

These cases, however, are not in point. *K Mart Corp.* merely recognized that under certain circumstances so-called "gray-market" goods may be imported and sold within the United States. *NEC Electronics* and *Monte Carlo Shirt, Inc.,* involved a charge of trademark infringement. None dealt with the question of whether, in defiance of California law, a "gray marketeer" may deliberately remove a manufacturer's serial number and, thereafter, without restriction, place such goods into the field of commerce.

Oddly, real parties also rely on *Norman M. Morris Corporation* v. *Weinstein* (5th Cir. 1972) 466 F.2d 137 despite the fact that decision strongly supports the People's position. The court in *Morris* not only held that the manner in which the defendant, Hyman Weinstein, conducted his operations violated section 43(a) of the Lanham Trade-Mark Act (15 U.S.C.A. § 1125(a)), it further held that he should be "enjoined . . . from selling [Omega] watches in the United States and Puerto Rico, which he purchased from retail dealers in Europe or elsewhere and which have the identifying digits in the serial numbers drilled out, unless he tells the buyers of the watches that he purchased them from retail dealers and that the digits in the serial numbers on the movements of such watches, by which they could be identified as watches made by the Omega Watch Company and tied to a guarantee of the Omega Company, have been drilled out and such watches are not guaranteed by the Omega Watch Company; unless he eliminates from the boxes or containers in which the watches are sold or elsewhere any

language purporting to be a guarantee of the watches by the Omega Watch Company; unless by the language of any guarantee furnished by him to a retail dealer who purchases a watch purporting to be an Omega watch from him, *which guarantee is to be given by such retail dealer to the person to whom he sells such watch, he makes it perfectly clear that it is solely the guarantee of Weinstein, not of the Omega Watch Company . . . .*" (466 F.2d at p. 143, italics added.)

In their catalog real parties apparently advise the retailers to whom they sell their altered items that they carry only their warranty. In the court hearing that preceded the order here under review, there was no showing what additional efforts, if any, were made to protect the purchasing public.

Real parties next assert that they had committed no offense because section 537e must be construed to require proof of an intent to defraud. However, their reliance upon *People* v. *Bratis* (1977) 73 Cal.App.3d 751 [141 Cal.Rptr. 45] is misplaced. That decision interpreted Business and Professions Code section 19666 which provides that "No person shall alter or counterfeit, or attempt to alter or counterfeit, any parimutuel ticket" and Business and Professions Code section 19667 which provides that "No person shall knowingly have in his possession any altered, forged, or counterfeit parimutuel ticket." The *Bratis* court held that when read in their entirety these sections could not be construed so as to apply to persons making an immaterial alteration without any intent to defraud. The court reasoned that the terms "altered," "forged" and "counterfeit" were terms found within section 470 et seq., and were, therefore, recognized as being within the definition of forgery. (73 Cal.App.3d at p. 757.)

Section 537e, on the contrary, forbids a person from knowingly possessing or selling personal property from which the serial number has been removed, defaced, covered, altered, or destroyed. Although the word "altered" appears in both statutes, in Business and Professions Code sections 19666 and 19667, it is joined with "counterfeit" and "forged," making clear the alteration referred to, and prohibited, was an alteration with intent to defraud. (*People* v. *Bratis, supra,* 73 Cal.App.3d at p. 757.) However, in section 537e "altered's" companionate terms are "removed," "defaced," "covered" and "destroyed"—none of which imply forgery.

Whether a criminal intent or a guilty knowledge is a necessary ingredient of a statutory offense is a matter of construction. (*Matter of Application of Ahart* (1916) 172 Cal. 762 [159 P. 160].) "[T]wo fundamental principles lie at the very threshold of the inquiry. The first of these principles is that the law will be upheld unless it be clearly obnoxious, and the other is that of two

permissible constructions that one under which the law is valid will be adopted as expressing the intent of the legislative body." (*Id.* at 764.)

Real parties argue, in essence, that section 537e must be considered "clearly obnoxious" because, if strictly enforced, a consumer who innocently removes a serial number from, for example, a kitchen appliance, could be prosecuted as being in violation of the statute. Ignoring the utter improbability of such a prosecution, there are yet compelling reasons why even a true consumer should not knowingly possess such products. The police are often able to use serial numbers to trace stolen goods. Such numbers also assist manufacturers in recalling an article, or in notifying a consumer of a problem with the product, as well as aiding in the prosecution or defense of a products liability lawsuit.

■ "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) ■ An injured plaintiff, of course, must first be able to identify the manufacturer (*Garcia* v. *Joseph Vince Co.* (1978) 84 Cal.App.3d 868, 874 [148 Cal.Rptr. 843]), and in the absence of a serial number, a potentially forged trademark alone might not prove sufficient. In other instances, a plaintiff may wish to discover the name of the manufacturer's suppliers—not merely to identify additional defendants—but to determine the cause of the defect in the product.

In addition, although it is not always the case, manufacturers sometimes tie their serial numbers to records which contain information concerning the source of the raw materials and/or component parts used in the manufacture or assembly of their products. When this is done, such records would also indicate when and where and from whom these goods were acquired. This information could be invaluable to both a consumer harmed by the product and the manufacturer being charged with the responsibility for the injury.

Real parties, of course, recognize that manufacturers use their serial number in tracking their products. In fact, with remarkable candor they described the problems they have encountered in their attempts to prevent these manufacturers from enforcing their distribution agreements. Because such producers distribute their products through a network of authorized companies, real parties secretly contacted these firms attempting to purchase brand name goods without the manufacturers' knowledge or consent. When successful, they were able to pay more than their suppliers' costs while yet reselling the products to other retailers at a profit.

When manufacturers became aware of this scheme, they used the serial numbers affixed to their products to track their goods. By this means they were able to discover the identity of those persons violating their agreements and to terminate their authorized relationships. At this juncture real parties decided to remove the original serial numbers, substituting their own, thereby deceiving the original manufacturers and potentially misleading the ultimate purchaser.

We need not determine whether such admitted conduct would constitute fraud, since we do not believe this is a necessary element of section 537e. Our conclusion in this respect is bolstered by the Legislature's 1949 enactment of Business and Professions Code section 19087. That section provides that "It is unlawful for any person, *except the purchaser for his own use*, to attempt to, or to remove, deface, alter or cause to be removed, defaced or altered, the label or any mark or statement thereon, placed upon any article of upholstered furniture, bedding, or filling material under the provisions of this chapter." (Italics added.)

It is thus apparent that our Legislature understood that there were certain identifying labels and/or marks on certain types of goods which could, at the purchaser's discretion, be removed. Serial numbers on merchandise of the variety here in issue, however, were not among them.

The only exception stated within section 537e is found in subdivision (c) which provides, "This section does not apply to those cases or instances where any of the changes or alterations enumerated in subdivision (a) have been customarily made or done as an established practice in the ordinary and regular conduct of business, by the original manufacturer, or by his or her duly appointed direct representative, or under specific authorization from the original manufacturer."

Real parties note that the word "manufacturer" is used in subdivision (a) of section 537e, rather than "original manufacturer." From this they urge that the Legislature must thereby have intended to imply that there could be two "manufacturers," i.e., the original one who actually manufactured the product and a subsequent one who, like real parties, purchased it, removed its serial number and replaced it with one of his own. They argue that such an interpretation would be consistent with Business and Professions Code sections 22410 and 22411 which impose a duty on a manufacturer to place a unique serial number on an appliance before it is sold. The term "manufacturer" is there defined to include any "distributor of a manufacturer who sells, transfers or exchanges an appliance to or with a retailer." (Bus. & Prof. Code, § 22410, subd. (b).)

However, the only reasonable interpretation of this section is that a distributor may affix its own serial number to an appliance, but only with the authorization of the original manufacturer. As noted, subdivision (c) of section 537e itself provides that the original manufacturer, or his or her "duly appointed direct representative" may, in the ordinary course of business, change or alter a serial number, or the original manufacturer may specifically authorize the change or alteration.

Such a proviso could not reasonably be construed to mean that by setting up a system of authorized distributors the original manufacturer has by implication authorized each of them to give a subsequent purchaser permission to change or alter the original manufacturer's serial number.

Real parties also point to California Uniform Commercial Code section 2403 which provides that a purchaser of goods acquires all title which his transferor had or had power to transfer. Of course, nothing contained within this section suggests that after acquiring title to personal property, the new owner becomes a second "manufacturer" who is authorized to alter, deface, or remove the original manufacturer's serial number.

■ We therefore conclude that the respondent superior court erred in ordering the unconditional return of the altered components by August 30, 1993, prior to a determination of their true character and even before the requisite new identification marks could be placed thereon by the police.

Of course, what ultimate disposition should be made of the subject items is a question not before us and one which has not been briefed by the parties. Nonetheless, it seems apparent that the Legislature, in tying section 537e to the sections treating stolen property (§ 1407 et seq.), did not envision the factual scenario here presented. We would recommend that these interlocking provisions be reviewed, and perhaps expanded, by that body at its earliest convenience since it seems clear the principal purpose of their joinder was merely to assist the victims of crime to promptly regain their property once it had been discovered in the possession of third persons. (See Busch, *Victim Rights in Stolen Property in California* (1976) 64 Cal.L.Rev. 1018.)

However, in the interim, we note that in their reply to the real parties' return to our order to show cause, the People advised us that the subject merchandise has now been marked and, in their view, need no longer be regarded as "contraband," i.e., property whose mere possession is illegal.

Consequently, it appears some appropriate arrangements might be possible which would permit these particular altered items to be returned to real

parties, even with a right to sell them if this can be done in a fashion which will ensure that the ultimate consuming purchaser will be explicitly made aware of their true nature and warned that the manufacturers' express warranties are no longer applicable. (Cf. *Norman M. Morris Corporation* v. *Weinstein, supra*, 466 F.2d at p. 143.)

If such an informal resolution is not possible, real parties may renew their motion in the municipal court in which the criminal prosecution is pending. Of course, whether before or after trial, that court will be required to make provision, not only for these particular items, but also for the real parties' future operations, e.g., it would clearly be impractical to allow them to continue their current mode of operation since this would require the police to constantly participate by re-marking all the merchandise that real parties might choose to alter.

Let a peremptory writ of mandate issue directing the superior court to set aside its order of August 25, 1993, granting The Wholesale Connection's motion for the return of the stereo components and issue a new and different order denying the motion.

The temporary stay issued August 27, 1993, is vacated.

Boren, P. J., and Nott, J., concurred.

A petition for a rehearing was denied January 25, 1994.